**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CHRISTOPHER COXON and
CAMILLA ZOE CUDDY,

          *Plaintiffs*,

v.

SUSAN M. COXON,

          *Defendant*.

Civil Action No. 23-30010

JURY TRIAL DEMANDED

**COMPLAINT**

1.      This an action for tortious interference with an expected inheritance brought by the children of the late James H. Coxon ("James"). In May of 2020, following James' diagnosis with dementia, and while he was suffering from diminished mental capacity and unrepresented by counsel, the defendant Susan M. Coxon ("Susan") intentionally interfered with James' estate plan by unduly influencing and causing him to execute new beneficiary designations for various investment accounts to name Susan as the sole primary beneficiary. Previously, the subject beneficiary designations designated each of his children, plaintiffs Christopher Coxon ("Christopher") and Camilla Zoe Cuddy ("Zoe"), as the primary beneficiaries.

2.      After it was revealed that new beneficiary forms executed in May 2020 drastically altered James' estate plan, James and his children attempted to negotiate a family agreement with Susan embodying James' actual dispositive intentions. Susan, however, continued to interfere at every turn. James's health and deteriorating cognitive state left him entirely dependent on Susan, and she used that dependency as leverage to prevent him from restoring his original estate plan or otherwise adjusting his estate plan in a manner that did not provide her with at least half of his

1

assets.  Previously, James had for decades structured his estate plan to leave a third or less of his estate to provide for Susan's health and maintenance during her lifetime, with the majority of his assets passing to his direct descendants.  Months were spent trying to reach an agreement acceptable to all family members.  Although James, with the assistance of counsel, and his children ultimately agreed on a suitable arrangement, Susan rejected it and prevented James from changing his estate plan to conform with his own wishes.

3.      Ultimately, James' estate plan, including his beneficiary designations, was amended in early 2022, but only to the extent that Susan would allow it.  Accordingly, rather than equitably distributing his assets between his children and Susan as had been his prior plan for 30 years, James' new estate plan now leaves Susan with one-half of his assets and his children with one-quarter each.  The result is that Susan's tortious interference redirected more than $4 million of James's assets from his children to Susan.

4.      Susan's interference and undue influence were applied continuously to James from at least May of 2020 through his death in October 2022.

## PARTIES

5.      Plaintiff Christopher Coxon is an individual residing at 47 Leigh Gate Road in Glastonbury, Connecticut.  Christopher is one of two children of the late James Coxon, and the father of his grandchildren Charles and Olivia.

6.      Plaintiff Camilla Zoe Cuddy is an individual residing at 180 East End Avenue, Apartment 16B, New York, New York.  Zoe is one of two children of the late James Coxon, and the mother of his grandchildren Cecilia and Bettina.

2224621

7.     Defendant Susan Coxon is an individual residing at 55 Lenox Road, West Stockbridge, Massachusetts.  Susan is the second wife and surviving spouse of the late James Coxon.

## JURISDICTION AND VENUE

8.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     Plaintiff Christopher Coxon is a citizen of the State of Connecticut and Plaintiff Camilla Zoe Cuddy is a citizen of the State of New York.

10.    Defendant Susan Coxon is a citizen of the Commonwealth of Massachusetts. There is thus complete diversity of jurisdiction among the parties.

11.    The amount in controversy exceeds $75,000 because Plaintiffs seek at least $4.1 million in damages.

12.    Venue is proper in this district under 28 U.S.C. § 1391(a) and (b) because Defendant Susan Coxon resides in the District of Massachusetts and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

### A.  James Coxon's Family and Estate Plans

13.    James Coxon was a successful investment banker who through decades of hard work accumulated significant assets worth nearly $12 million at the time of his death.

14.    Christopher and Zoe are the children of James and his first wife, Donatella. James and Donatella separated in 1983 and later divorced.  Donatella passed away from cancer in 2014.  Christopher and Zoe are the parents of James' four grandchildren.

2224621

15.     In 1992, James married Susan.  Susan had no children and no dependents, and James and Susan did not have children together during their marriage.

16.     Susan did not have significant assets prior to her marriage to James.

17.     For decades prior to his death, including after his marriage to Susan, James consistently structured his estate plan so that, upon his death, at least two-thirds of his assets would pass to Christopher and Zoe, and no more than one-third would pass to Susan.  James regularly shared the details of his estate planning and his intentions with his children, often in letters drafted at the end of the year in which he advised them of his current assets, his dispositive intentions, and his current estate plan.

### 1.     James' 1992 Estate Plan

18.     Prior to his marriage to Susan, James' estate plan left the entirety of his assets to his children.  In 1992, following his marriage to Susan, James executed a new estate plan that provided for an approximate division of his assets to his children and Susan on a one-third each basis.

19.     James' 1992 will left his tangible personal property to Susan and provided that the residue of his estate would pass one-third each to Susan, Christopher, and Zoe.  James' residence was owned jointly with Susan and would pass to her upon his death.  As James explained in letters to his children, he had also designated them to receive life insurance proceeds of approximately $1.7 million, his Fidelity Profit Sharing Plan and his Harvard Deferred Compensation Plan.  James also explained that a smaller Kemper Profit Sharing Plan would pass entirely to Susan.

20.     James' 1992 will nominated Christopher as his executor, with Zoe nominated as successor.

21.     The effect of the dispositions provided in James' 1992 estate plan would have been to leave approximately one-third of James' estate to Christopher, Zoe, and Susan, given the value of James' assets at that time.

**2.      James' 1999 Estate Plan**

22.     In 1999, James accepted a new job with the New York State Teachers Retirement Fund as a Senior Investment Analyst and moved from Connecticut to West Stockbridge, Massachusetts.  James updated his estate plan following these changes.

23.     James' 1999 will again left his tangible personal property to Susan, but left the residue of his estate, including a substantial account at U.S. Trust then valued at approximately $2.2 million, to Christopher and Zoe alone.  James' residence, certain retirement accounts, and certain life insurance policies would pass to Susan.  Another $1.6 million life insurance policy was held in trust for the benefit of Christopher and Zoe.

24.     In March, 1999, James sent a letter to his children describing the new will he was executing and stating "I'll juggle the rest so as to come out to 1/3 x 3 division as per the spirit of the will."

25.     In another letter to his children sent in September, 2000, James explained that the value of the life insurance policy held in trust was approximately $717,000, and that his intention was that, after his death, Christopher invest those assets to provide annual support to Donatella, Christopher and Zoe's mother, with the assets passing to Christopher and Zoe upon Donatella's death.  James also wrote in that letter that the "remainder of my estate divides 3 ways (Chris/Zoe/Susie) under my Will, of which Chris is the executor."

2224621

### 3.   James' 2010 Estate Plan

26.     As James' assets continued to grow, he made further adjustments to his estate plan in an effort to ensure that Susan was left with sufficient assets to protect her during her lifetime, but that the majority of his assets would pass to his children and their families.

27.     In 2010, James executed a new will, again leaving his tangible personal property to Susan and the residue of his probate estate to his children.

28.     In addition, because James' retirement assets had grown considerably and represented a more substantial share of his estate, he made adjustments to his beneficiary designations.

29.     In 2011, James executed new beneficiary designations for his retirement accounts at U.S. Trust, changing the primary beneficiary from Susan to his descendants, *per stirpes*. James left Susan as the beneficiary of only his New York State Teachers Retirement Fund Deferred Compensation Plan, and a single retirement account at Fidelity.

30.     In 2013, James executed a springing power of attorney designating his son Christopher as his attorney-in-fact in the event of incapacity.

31.     On information and belief, by this time, James also had made substantial lifetime gifts to Susan totaling approximately $2 million.

32.     On information and belief, as a result of these changes, and using approximate asset values from 2015, James' estate has an approximate value of $9.38 million.  Had James passed away at that time, under his then-current estate plan Christopher and Zoe would have received approximately $3.75 million each of James' assets.  On information and belief, Susan would have received approximately $1.8 million upon James' passing, but a total of $3.8 million when James' lifetime gifts are included.  Accordingly, James' estate plan, beneficiary

6

designations, and lifetime gifting would certainly have provided for Susan's health and maintenance during her remaining lifetime, but almost 80% of his estate passed to his children, Christopher and Zoe.  This was James' final estate plan prior to his dementia diagnosis.

### B.     James' Declining Health

33.     James retired from the New York State Teachers Retirement System in 2014.

34.     By 2017, James had stopped using email and his personal cell phone to communicate.  He also stopped driving around this time.  As such, his ability to travel and communicate with others was largely dependent on Susan.

35.     Christopher and Zoe also began to notice changes in James' behavior and cognitive abilities.  They raised concerns about James' health with Susan in 2019.

36.     In May 2019, Susan informed Christopher and Zoe by email that James "is at the beginning of dementia" but that "he's not loony, just forgetful."

37.     In fact, however, James' primary care physician had documented neurological concerns more than a year earlier, in April 2018.  In February 2019, James' primary care physician noted that James and Susan reported that "things have gotten substantially worse" and that James "has a higher level of confusion."  The concerns were serious enough to prompt a CT-scan in February 2019.

38.     In March 2019, James was evaluated for a seizure, and an MRI suggested the existence of Cerebral Amyloid Angiopathy ("CAA").

39.     In August 2019, James underwent a neuropsychological evaluation by Dr. Sarah Marshall.  Dr. Marshall found that James suffered from "notable confusion" and "severe deficits in several areas."  She concluded that he "has memory and cognitive deficits well above what

can be attributed to normal aging," and that he likely suffered from depression, dementia, and possible CAA.

40.    James' subsequent medical records show a continued decline in his cognition and a lack of appropriate intervention and care by Susan.  For example, despite warnings from James' physicians, Susan allowed him to continue drinking three to four glasses of wine a day (contravening his daily use of lithium for bipolar disorder).

### C.    Susan's Intentional Interference With James' Estate Planning

41.    In January, 2020, Christopher, Zoe, and their spouses visited James and Susan at their home in Stockbridge.  During that meeting, Christopher and Zoe again voiced concerns about James' health and declining mental state.  They suggested that James needed the assistance of an attorney to review his finances and estate planning.

42.    Susan's reaction was angry and aggressive.  She told Christopher and Zoe (and their spouses) that she "gets it all" and that she would decide how much of James' estate, if any, to share with his family following *her* death.

43.    After that visit, Christopher spoke with his father privately and suggested that he meet with Gina Barry, an elder law attorney.  James agreed to do so.

44.    Susan, however, prevented James from meeting with Attorney Barry.  For example, when Christopher reached out to Susan by text on February 21, 2021, to schedule a time for the meeting, Susan responded: "Hi Chris, Your dad did not agree to that.  No we will not meet with her.  Happy tho [sic] meet with you and Zoe with spouses at our place to discuss your ideas."

2224621

45.     Later, on March 9, 2020, when Christopher again texted Susan to confirm a planned meeting between James and Attorney Barry, Susan responded: "Chris Your dad is of sound mind and doesn't need help with his investments.  They are HIS investments not yours."

46.     In fact, however, only a week earlier Susan and James had met with Dr. Susan Mahler, a psychiatrist.  Dr. Mahler's notes from that visit state that James presented with "evidence of memory loss as well as cerebral angiopathy."  Dr. Mahler further recorded that Susan had reported that James was having "more trouble with memory" and that Susan "has Visiting Angels come once a week so she can bowl.  Does leave him alone for about an hour at a time."  Dr. Mahler further observed that "today Jim is not able to answer questions, but responds with standard recitations of his past work and knowledge."

47.      Susan did not disclose this visit with Dr. Mahler to Christopher and Zoe at the time, and instead insisted that James was "of sound mind" notwithstanding Dr. Mahler's observations.  Susan knew that James was vulnerable and was concerned enough about his mental state that she brought in a caretaker for him so that she could leave the house to go bowling.

### 1.  The 2020 Change of Beneficiaries

48.     Unbeknownst to Christopher and Zoe, in May of 2020 Susan began having discussions with Bank of America about James' financial portfolio.  Bank of America was the successor to U.S. Trust and it managed the majority of James' investments, including retirement and non-retirement accounts.

49.     Susan also has investment accounts at Bank of America.  The same private client advisor at Bank of America worked with James and with Susan.

50.     In connection with the discussions about James' portfolio, Bank of America sent new beneficiary forms to James in May of 2020 for his retirement accounts.

51.     Prior to May 2020, James had designated his children Christopher and Zoe as the beneficiaries of his retirement accounts at Bank of America (then U.S. Trust) pursuant to his estate planning done in 2010-2011.

52.     In May 2020, however, new beneficiary designations were executed for James' retirement accounts at Bank of America naming Susan as the primary beneficiary and Christopher and Zoe as mere contingent beneficiaries.

53.     This was a significant change to James' estate plan.  As a result of the change of beneficiary on the Bank of America retirement accounts, approximately $5.7 million of assets that would have passed to Christopher and Zoe upon James' death were instead designated to pass to Susan.

54.     Christopher and Zoe have never been provided with the forms that changed James' beneficiary designations in May of 2020.

55.     James did not understand that the new beneficiary forms caused a changed to the disposition of his estate and did not intend to make such a change.  When James later discussed the changes that were done in May 2020 with Christopher and Zoe, he said that he did not know what changes had been made.

56.     Upon information and belief, Susan was directly involved in the execution of the new beneficiary designations for James' retirement accounts.

57.     She did not, however, explain to James that by executing the forms he would be making a drastic change to his estate plan and would be leaving her with more than $5 million that he had previously designated to pass to his children.

58.     Upon information and belief, Susan had him execute new beneficiary designations knowing he did not understand them.

59.     James was not represented by counsel in connection with the change of beneficiaries that was done in May of 2020.  Although Christopher and Zoe had attempted to have their father meet with Attorney Barry since February 2020, Susan consistently interfered with and prevented those meetings from occurring.

60.     Bank of America was not aware in May of 2020 that James' new beneficiary designations represented a significant departure from his prior estate plan.  Bank of America was also unaware that James had experienced significant cognitive decline.  At the time the changes were made, no one from Bank of America discussed the significance of the changes with James.

61.     In August 2020, Susan disclosed to Christopher and Zoe that she had been meeting with Bank of America regarding certain changes to James' financial portfolio.  Susan, however, was unable or unwilling to explain the nature of those changes.  James separately told both Christopher and Zoe that he did not know what changes had been made.

62.     Christopher and Zoe asked James and Susan if they could meet with Bank of America to understand what changes had been made.

63.     Susan strongly resisted having Christopher and Zoe speak with Bank of America, and she insisted that before such a meeting they sign a written agreement stating that they could "listen and ask questions <u>only</u>."

64.     A telephone conference with Christopher, Zoe, Susan, James, and representatives of Bank of America was held on November 13, 2020.  During that conference Christopher and Zoe first learned that the beneficiary designations for James' retirement accounts had been

changed, and that Susan (rather than Christopher and Zoe) was now the sole primary beneficiary of all of James' retirement accounts at Bank of America.

65.     Following the November 2020 meeting with Bank of America, Susan became even more aggressive towards Christopher and Zoe.

66.     During a phone call on or about November 18, 2020, Susan yelled at Christopher about the meeting with Bank of America and hung up on him.  After the call Susan sent a text message to Christopher stating: "I'm not calling at the moment.  The split will be 60 me 40 you like your dad had said originally.  [I'll] figure the split later."  James had never made any prior statements to Christopher or Zoe relating to this type of "split."

67.     On November 24, 2020, Susan sent an email to Christopher and Zoe stating:

> I must admit that I was originally pretty mad, angry and disappointed with the whole thing and couldn't talk.  Your Dad and I have had the chance to talk more and think that we have come to an agreement that is fair for all.  I understand that you are your Dad's blood and deserve an inheritance.  The reason why I want some for my side is pretty simple.  Since I was beyond birthing years when I married Jim, we basically adopted my brothers and sister's kids.  They were with us for the first five years of our marriage spending a lot of time melding with us.  Unfortunately during the 5 years we spent in Ct we were not able to spend time melding with your kids for various reasons.
>
> Your Dad said he doesn't want to spoil you since you've already received 2 million each from Donatella.  He/we agree that splitting everything 1/3 to Zoe 1/3 to me and 1/3 to Chris is amicable.  He wants the money to come to me first because since all his finances are in stocks and the market is not reliable.  If we had a recession, the pot would shrink accordingly.

68.     Susan's email contained several fallacies.  For one, Christopher and Zoe had not inherited $2 million each from their mother Donatella, a fact that James surely knew or would have known prior to his cognitive decline.  In addition, James never mentioned Susan's nieces and nephews to Christopher or Zoe, and certainly never mentioned wanting to provide for them

as part of his estate planning. This was a clear attempt by Susan to construct a narrative which would support her interference with James' estate planning, and her corresponding demands for a larger share of his assets.

69.     A few days later, Susan advised Christopher and Zoe that attorney Jeffrey Roberts had been retained to represent James.

## 2. Efforts to Reach a Family Agreement

70.     Following the retention of Attorney Roberts, lengthy negotiations took place for more than a year in an effort to restore James' estate plan to what he had intended prior to the May 2020 change of beneficiaries. Throughout this process, Susan continuously and improperly interfered with James' attempts to restore his estate plan to provide for an equitable distribution of his assets to Susan, Christopher, and Zoe.

71.     Attorney Roberts held an initial family meeting with James, Susan, Christopher, and Zoe in December 2020. During that meeting Attorney Roberts observed that it was inconceivable that Susan would spend $5 million during her remaining lifetime, and he suggested an estate plan aimed at providing Susan with $200,000 per year in income following James' death. James did not object to Attorney Roberts' proposal.

72.     Following the meeting, Attorney Roberts proposed an estate plan whereby more than $3 million of James' retirement accounts, plus their jointly held assets (including real estate and a joint checking account) would pass to Susan, and James' remaining assets would pass to Christopher and Zoe in equal shares. This plan was generally consistent with James' estate plans prior to Susan's interference.

73.     Christopher and Zoe agreed with Attorney Roberts' proposal, but Susan rejected it. She wrote in an email in February, 2021: "I think there was another misunderstanding

amongst us.  My impression was we would distribute into 3 AFTER I died not when your Dad

died."  There was no misunderstanding, and such an arrangement was never discussed with

Attorney Roberts.

74.     Thereafter, Susan continued to attend James' meetings with Attorney Roberts and

began demanding 50% of James' estate, in contravention to James' longstanding estate plan.

Susan insisted that Christopher and Zoe be excluded from those meetings, in contrast to James'

consistent practice of keeping his children informed of his estate plan and any changes.

75.     In the meantime, James' health and cognitive ability continued to decline.  In

January 2021, Susan stated in a text message to Christopher and Zoe that "last night [James]

couldn't remember what town we lived in nor address nor phone# . . . .  They ran more tests and

still found nothing except that there seemed to be more signs of dimentia [sic]."

76.     On June 4, 2021, James was having trouble breathing.  Rather than take him to a

doctor, Susan gave him her own prescription inhaler.  Only after repeated requests by

Christopher did Susan take James to the hospital, where he was diagnosed with pneumonia.

77.     On June 8, 2021, James was evaluated by Dr. Emily Clionsky, MD, a psychiatrist.

Among other things, Dr. Clionsky observed that James believed the season was winter when in

fact it was summer, he could not recall and repeat three common words in sequence, he could not

draw the numbers on a clock, he demonstrated severe short-term memory deficits and severe

impairments in executive function, and he was in poor physical health.

78.     Dr. Clionsky also observed that James was quick to sign his name to a form when

asked to do so, without question or hesitation, demonstrating "extreme suggestibility and

malleability."

79.     Dr. Clionsky concluded that James suffered from dementia at a moderately severe level.

80.     Meanwhile, because Susan had rejected Attorney Roberts' original plan, the family attempted to agree upon a different compromise that would provide more assets to Susan but would include an irrevocable reversionary interest for Christopher and Zoe to assure that assets not reasonably needed for Susan's health and maintenance during her lifetime would pass to James' children as he intended.

81.     These terms were eventually memorialized in a document titled the "Coxon Family Agreement."  In August, Attorney Roberts sent a draft of the Coxon Family Agreement to Christopher and Zoe stating that it had been "agreed to by Jim and Sue."  Shortly thereafter, however, Susan reversed course, rejected the agreement, and refused to allow James to sign it.

82.     Throughout 2020 and continuing until James' death, Susan was able to overcome James' free will because his mental and physical capacity was substantially diminished, and he was totally dependent on her.  James relied on Susan to feed him, wash him, attend to his numerous health needs, keep him safe in the house, and for nearly all activities of daily living. Susan also continued to provide James with alcohol (contrary to medical advice).

83.     Susan also overcame James' free will by isolating him from others, especially his children.  Throughout 2021, Susan interfered with Christopher and Zoe's efforts to visit their father.

84.     For example, shortly after Dr. Clionsky evaluated James at his home, Susan sent a text message to Christopher and Zoe cancelling a planned to visit between James, Christopher and Zoe, and their children (James' grandchildren).  Sue wrote in her text: "Well since you both

have spent some time with him, the weekends off. Canceled. Don't come. You are not welcome."

85.     On another occasion, James called Christopher and left a message seeking to confirm Christopher's plan to visit him for lunch. Moments later Susan called back and left a message saying that James "forgot what he was saying" and that what he meant to say was that lunch that day was "impossible" because James had hurt his leg.

86.     Susan has a dominant personality, and in his diminished condition James was unable to stand up to her or resist her demands. On information and belief, James succumbed to Susan's wishes regarding his estate planning because he was afraid that, if he did not, Susan would no longer provide him with adequate care.

87.     In 2021, James repeatedly stated to Attorney Roberts and to Christopher and Zoe that "my problem is Susan" and that Susan was "very powerful" and "dominant."

88.     Susan's efforts to control James' estate planning went so far as Susan herself (a non-lawyer) drafting a document regarding James' purported dispositive intentions and having James sign it. In 2021, Susan presented Attorney Roberts with a document that she had James sign. The document stated:

> Jim and Sue have discussed this recent scenario regarding this 'agreement' that Jeff has been working on. Jim originally wanted a new will but that did not plan [sic] out. Jim now wants to go back to his will of 2020 with Jeff being power of attorney and beneficiaries to remain as of 2020. Sue will put the kids as primary recipients of all things of Jim's matters after my death.

89.     Attorney Roberts sensibly disregarded the document as not indicative of James' intentions. However, the document nevertheless demonstrates the lengths Susan was willing to go to in her efforts to interfere with James' estate planning for her personal benefit in contravention of James' intentions.

2224621

90.     In November of 2021, Attorney Roberts presented yet another version of the "Coxon Family Agreement."  This version provided that: (a) James' assets would be divided between Susan and James' children on a 50/50 basis after his passing, (b) those assets would be irrevocably protected from transfers during James' lifetime, and (c) that Susan would irrevocably designate James' children as the beneficiary of those assets in her own estate planning.  On November 24, 2021, Attorney Roberts sent this version of the Coxon Family Agreement to Christopher and Zoe and stated that it was "approved for signing by Jim and Sue Coxon."

91.     Although Christopher and Zoe still had serious concerns about the Coxon Family Agreement's departure from James' longstanding plan to equitably divide his assets between Susan, Christopher, and Zoe, they were willing to accept it in the hopes that it would put an end to the disputes regarding James' estate planning and would protect his estate from further changes.  Accordingly, Christopher and Zoe signed the Coxon Family Agreement on December 15, 2021.

92.     Once again, however, Susan prevented the plan from being implemented.  After Attorney Roberts stated that the Coxon Family Agreement was acceptable to James and Susan, Susan dismissed her personal attorney Karen Johnson, retained new counsel, and refused to sign the agreement.  Because the Coxon Family Agreement required that Susan irrevocably designate James' children as beneficiaries of assets she received from James, the agreement could not be implemented without her cooperation.

### 3.  The 2022 Estate Plan

93.     In January 2022, James executed new estate planning documents.  Christopher and Zoe were not apprised of the new estate plan until after the fact.  His new will left his tangible personal property to Susan and stated that the assets held in two Bank of America

accounts should be divided by providing 50% to Susan and 50% to Christopher and Zoe in equal shares.  The 2022 will nominates Attorney Roberts as personal representative.

94.     As part of the January 2022 changes to his estate plan, James also executed new beneficiary designations for other bank accounts.  Those beneficiary designations provided that Susan would receive 50% of the assets in James' accounts and that Christopher and Zoe would receive the other 50% in equal shares.

95.     The estate planning documents executed by James in January 2022 contain no reversionary provisions ensuring that assets passing to Susan would eventually distribute to James' children upon Susan's death to the extent not needed during Susan's lifetime.  They likewise did not contain any provisions protecting the assets designated for his children from being transferred during his lifetime.  Susan refused to accept any such provisions when she rejected the Coxon Family Agreement.

96.     On information and belief, James did not further provide for his children in the 2022 estate planning documents because he was afraid of Susan, and in particular afraid that if he left more than 50% of his assets to his children or left assets for Susan in a trust, Susan would be angry with him and would no longer provide him with adequate care.

97.     Throughout 2022, James' health continued to deteriorate.  By May 2022, he was admitted to Berkshire Medical Center with an infection and high fever.  After several weeks in the hospital, he was transferred to a secure dementia facility at Hillcrest Commons in Pittsfield, Massachusetts.  Approximately 4 months later, on October 5, 2022, James passed away.

98.     The cause of death listed on James' death certificate is vascular dementia.

**D.     Christopher and Zoe's Damages**

99.     James died with assets worth nearly $12 million.

100.    Under the estate plan in place prior to Susan's interference beginning in 2020, approximately $9.665 million of James' assets would have passed to Christopher and Zoe upon his death.  The remaining assets worth close to $2.2 million would have passed to Susan, along with approximately $2 million in lifetime gifts James had made to her.

101.    As a result of Susan's interference, under the estate planning in place at the time of James' death, Susan will instead receive approximately $6.23 million, plus the $2 million in lifetime gifts she received from James.  Susan is currently 75 years old with no dependents.  It is inconceivable that she will spend $8 million during her remaining lifetime, even if she continues to live the comfortable lifestyle enjoyed during her marriage with James.  A substantial portion of James' assets will therefore ultimately pass not to his family, as he always intended, but to whomever Susan chooses.

102.    As a result of Susan's interference, under the estate planning in place at the time of James' death, approximately $5.531 million will pass to Christopher and Zoe – i.e., $2.76 million for each family.  Accordingly, as a result of Susan's tortious interference with their expected inheritance, Christopher and Zoe have been damaged in the amount of approximately $4.134 million.

## COUNT I
### (Intentional Interference with Expected Inheritance)

103.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    As James' children and individuals specifically named in James' prior estate planning documents, including beneficiary designations executed by James prior to 2020, Christopher and Zoe each have a legally protected interest in their expected inheritance.  James informed his children of the contents of his estate plan, including the beneficiary designations

19

pursuant to which they would inherit.  Christopher and Zoe's expectation of inheriting pursuant to James' beneficiary designations and other provisions of his estate plan qualifies as a legally protected interest.

105.    Through her conduct described above, Susan intentionally interfered with Christopher and Zoe's expected inheritance in an unlawful way, including by pressuring and unduly influencing James, preventing him from retaining counsel, and misrepresenting the extent of his cognitive problems to his family.

106.    Through her conduct described above, Susan's intentional and unlawful interference acted continuously on James from at least May of 2020 through the date of James' passing on October 5, 2022, when Christopher and Zoe's expectancy would otherwise have been realized.

107.    As a result of Susan's intentional and unlawful interference with Christopher and Zoe's expected inheritance, Christopher and Zoe have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court order the following relief:

A.  Enter judgment in Plaintiffs' favor on the foregoing Count;

B.  Award Plaintiffs damages in an amount to be determined at trial, plus interest;

C.  Award Plaintiffs additional monetary relief, including attorneys' fees and costs, in amounts to be determined at trial; and

D.  Grant such other and further relief for Plaintiffs as deemed just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

20

Respectfully submitted,

CHRISTOPHER COXON and
CAMILLA ZOE CUDDY

By their Attorneys,


/s/ Ryan P. McManus
Ryan P. McManus, BBO #673219
HEMENWAY & BARNES LLP
75 State Street
Boston, MA 02109
(617) 227-7940
rmcmanus@hembar.com

Dated:  January 27, 2023

2224621